## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO:

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and
STATE FARM FIRE & CASUALTY
COMPANY,

      Plaintiff,

vs.

B&A DIAGNOSTIC, INC. n/k/a OASIS
MEDICAL CENTER CORP., ESTEBAN GENAO,
ALEX ALONSO, M.D., ERNESTO ALVAREZ
VELASCO and JOSE ANGEL ORTIZ MAZA,

      Defendants.

_____/

### COMPLAINT

Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (collectively referred to as "State Farm"), for their Complaint, allege as follows:

### Nature of the Case

1.    The claims in this case arise out of claims for auto insurance benefits submitted by Defendant B&A Diagnostic, Inc. ("B&A") for purported diagnostic X-ray, MRI and other radiologic services that were unlawfully rendered to obtain insurance payments from State Farm which total in excess of $2,200,000.

2.    Because B&A at all times relevant to this Complaint operated as a health care clinic licensed by Florida's Agency for Health Care Administration ("AHCA"), it was required to employ a Medical Director that complied with all applicable Florida law.

3. Further, B&A was required to ensure that the x-ray services performed on its patients were performed by technicians that were properly employed, supervised, and lawfully certified to perform those services in accordance with Florida law.

4. In addition to the obligations placed upon B&A, the Medical Directors it employed, Defendants Esteban Genao (formerly Esteban Genao, M.D.) and subsequently Alex Alonso, M.D., each had an obligation to perform the statutory duties required of Medical Directors under Florida law. Specifically, they were obligated to ensure the appropriate certification for technicians employed at B&A, to ensure that the services for which B&A billed were not fraudulently or unlawfully rendered, to enter into a written agreement with B&A setting forth their obligations under Florida law, and were required to serve as a "watch dog" to ensure B&A was otherwise operating in compliance with Florida law.

5. Finally, Defendant Ernesto Alvarez Velasco had an obligation to obtain the statutorily required certification and to comply with Statutory and Administrative Code provisions relating to certification prior to performing radiological services on patients, including State Farm's insureds, and Defendant Jose Angel Ortiz Maza had an obligation to only perform radiological services in a clinic which could lawfully employ him and that provided the required level of supervision in his performance of radiological services.

6. As a result of Defendants failure to meet these obligations, State Farm seeks to recover the amounts it paid to Defendants based upon Unjust Enrichment. State Farm further seeks a declaratory judgment confirming that State Farm is not obligated to pay any of B&A's bills, to the extent they remain unpaid, because the services were not "lawfully provided," which is a condition to obtaining no-fault/personal injury protection and medical payments coverage benefits (collectively referred to herein as "PIP benefits") under Florida law and the collective

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

policies of insurance, and because no statement for medical services may be submitted under PIP for the services that were unlawful at the time rendered. *See* §627.736 (1)(a), (5)(b) and (5)(d) Fla. Stat.; *see also* §400.9935(3), Fla. Stat.

## Parties

7.     Plaintiff State Farm Mutual Automobile Insurance Company, is an Illinois domestic property and casualty insurer organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois. State Farm Mutual Automobile Insurance Company is licensed to engage in business in the State of Florida as a foreign corporation and is doing business in Miami-Dade County, Florida.

8.     Plaintiff State Farm Fire & Casualty Company is an Illinois corporation with its principal place of business in Bloomington, IL. State Farm Fire & Casualty Company is licensed to engage in business in the State of Florida as a foreign corporation and is doing business in Miami-Dade County, Florida.

9.     Each of the Plaintiff State Farm companies issued automobile insurance policies in Florida and made substantial insurance payments to, or for the benefit of, the Defendants.

10.     Prior to January 30, 2013, B&A was doing business at 8150 S.W. 8th Street, No. 118, Miami, Florida 33144.

11.     On January 30, 2013, B&A filed with the Florida Department of State Division of Corporations a "Name Change Amendment" changing the name of B&A to "Oasis Medical Center Corp."

12.     According to filings with the State of Florida, B&A n/k/a Oasis continues to do business at 8150 S.W. 8th Street, No. 118, Miami, Florida 33144.[1]

---

[1] B&A and B&A n/k/a Oasis is referred to throughout the Amended Complaint collectively as "B&A."
{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

13.     From March 21, 2008 to November 16, 2011, B&A submitted medical bills to State Farm for services allegedly rendered to its insureds pertaining to diagnostic services.[2] Specifically, B&A globally billed State Farm for diagnostic services pertaining to both the technical component (the physical taking of the x-ray or MRI) and the professional component (the interpretation of the X-ray or MRI by a physician) of the radiologic service.

14.     Defendant Esteban Genao (formerly Esteban Genao, M.D. hereinafter "Genao") is a citizen of Florida and resides in Miami-Dade County.  Genao was designated by B&A, through its owner Felipe Aguilar, as the Medical Director for B&A from March 21, 2008 through March 31, 2010.

15.     Defendant Alex Alonso, M.D. ("Alonso M.D.") is a citizen of Florida and resides in Miami-Dade County.  On April 1, 2008, Alonso M.D. was designated by B&A, through its owner Felipe Aguilar, as the Medical Director for B&A and remained the appointed Medical Director at B&A for the relevant time period of April 1, 2010 through November 16, 2011.

16.     Defendant Ernesto Alvarez Velasco ("Alvarez") is a citizen of Florida and resides in Miami-Dade County.  Alvarez was employed by B&A to perform X-ray scans on patients.

17.     Defendant Jose Angel Ortiz Maza ("Ortiz") is a citizen of Florida and resides in Miami-Dade County.  Ortiz was employed by B&A from roughly July 2009 through in or about November 2013 to perform X-ray services on patients.

---

[2] This Complaint only addresses the specific conduct of the Defendants from March 2008 through November 2011 (the "Relevant Time Period.")   By only addressing the services performed within the Relevant Time Period, State Farm does not suggest that other services allegedly provided by B&A to State Farm insureds during other time periods necessarily complied with all applicable law.  Rather, this Complaint is narrowly tailored to the issues contained herein.
{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

## Jurisdiction and Venue

18.     This Court has jurisdiction over the matter, pursuant to 28 U.S.C. § 1332, based upon the diverse citizenship of the parties and the amount in controversy which exceeds $75,000.00 exclusive of interests and costs.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to State Farm's claims occurred in this judicial district, Defendants reside and/or do business in this judicial district, and the conduct of Defendants has resulted in actionable conduct in this judicial district.

## Factual Allegations

### Florida's Motor Vehicle No-Fault Law ("No-Fault Law") §627.730 *et. seq.,* Fla. Stat. (2009-2011).

20.     Florida's Motor Vehicle No-Fault Law requires $10,000.00 in mandatory coverage for Florida automobile policy holders.  This coverage, called Personal Injury Protection coverage ("PIP"), provides victims of motor vehicle accidents benefits for 80% of reasonable, necessary, related and lawful treatment irrespective of fault.

21.     Medical Payments Coverage ("MPC") is an optional coverage that provides additional benefits to the $10,000.00 in PIP benefits.

22.     Florida Statute §627.736(1)(a) sets forth what benefits ***shall*** be covered under PIP. This section states, in pertinent part, that "...*the medical benefits **shall** provide reimbursement only for such services and care that are **lawfully provided, supervised, ordered or prescribed...*".  §627.736(1)(a), Fla. Stat. (emphasis added).

23.     Florida's No-Fault Statute further provides that "[a]n insurer is not required to pay a claim or charges for any service or treatment ***that was not lawful at the time rendered***." §627.736(5)(b)(1)(b), Fla. Stat. (emphasis added).

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

24.     "Lawful" or "lawfully" means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment.  §627.732(11), Fla. Stat.

25.     Florida's No-Fault Law also provides that "[n]o statement of medical services may include charges for medical services of a person or entity that performed such services *without possessing the valid licenses required to perform such services*."  §627.736(5)(d), Fla. Stat. (emphasis added).

26.     The Statute provides further that "[a]n insurer is not required to pay a claim or charges for any service or treatment, bill or statement that *does not substantially meet the applicable requirements of paragraph (d).*"  §627.736(5)(b)(1)(d), Fla. Stat. (emphasis added).

27.     Florida law also requires that at each initial visit, a patient must fill out a "Disclosure and Acknowledgment Form" indicating the services which were received.  It is required that the form be signed by the patient, as well as by the medical provider. §627.736(5)(e), Fla. Stat.

28.     Specifically, "[t]he licensed medical professional rendering treatment for which payment is being claimed must sign, by his or her own hand, the form complying with this paragraph."  §627.736(5)(e)(4), Fla. Stat.  This document serves many purposes, including identifying the provider who is rendering services identified on the form.

### The Radiological Personnel Certification Act ("RPCA")
### §§468.3001 *et. seq.,* Fla. Stat. (2009-2011)
### Chapter 64E Florida Administrative Code

29.     It is the declaration of the RPCA to protect "the health and safety of the people … against the harmful effects of excessive and improper exposure to ionizing radiation.  Such protection can in some major measure be accomplished by *requiring adequate training and*

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

*experience of persons who use radiation and radiation-emitting equipment* in each particular case under the specific direction of licensed practitioners. It is the purpose of this part to establish standards of education, training, and experience and to *require the examination and certification of users of radiation and radiation-emitting equipment.*" §468.003, Fla. Stat. (emphasis added).

Radiologic Technologists.

30.      Under the RPCA, one may not engage in the "use of radiation or otherwise practice radiologic technology or any of the duties of a radiologist assistant on a human being unless he or she; (b) *Is the holder of a certificate*, as provided in this part, and is operating under the direct supervision or general supervision of a licensed practitioner in each particular case". §468.302(1), Fla. Stat. (emphasis added).

31.      Further, the RPCA provides: "A person *holding a certificate* as a radiologic technologist may only use radiation or radiation-producing equipment on human beings for diagnostic or therapeutic purposes while operating, in each particular case, under the general supervision of a licensed practitioner and only if the application of radiation is limited to those persons or parts of the human body specified in the law under which the practitioner is licensed." §468.302(4), Fla. Stat. (emphasis added).

32.      "Certificate" for purposes of the RPCA is defined as "certification granted and issued by the department under this part." §468.301(3), Fla. Stat.

33.      "Department" for purposes of the RPCA is defined as "the Department of Health". §468.301(6), Fla. Stat.

34.      "Radiologic technologist" for purposes of the RPCA is defined as a "person, other than a licensed practitioner, who is qualified by education, training, or experience, as more

specifically defined in s. <u>468.302</u> (3) (d) – (g), to use radiation on human beings under the specific direction and general supervision of a licensed practitioner in each particular case". §468.301(15), Fla. Stat.

35.     "Licensed practitioner" for purposes of the RPCA is defined as a "person who is licensed or otherwise authorized by law to practice medicine, podiatric medicine, chiropody, osteopathic medicine, naturopathy, or chiropractic medicine in this state". §468.301(11), Fla. Stat.

36.     The RPCA gives to the Board of Health (the "Board") the authority to make rules that may be necessary to carry out the provisions of the Act.  This includes rules pertaining to the certification of radiologic technologists. §468.303, Fla. Stat.

37.     The Florida Administrative Code ("F.A.C.") requires that non-physician operators of medical x-ray systems ***shall be certified*** in accordance with Chapter 64E-3, F.A.C.  *See* 64E-5.502(1)(a)(2), F.A.C. (emphasis added).

38.     Chapter 64E-3 requires that radiologic technologists seek certification from the Board prior to rendering radiologic technology on patients. 64E-3.003; 64E-3.004; 64E-3.006, F.A.C.

39.     The certification process includes not only the completion of an examination, but also completion of a detailed application; submission of an application fee; proof of appropriate educational credentials, good moral character, and appropriate age; completion of questions pertaining to criminal history and discipline history; along with the proof of completion of an HIV/AIDS course.  § 468.304, Fla. Stat.  *See sample "General Information and Application Instructions Application of Radiologic Technology Certification" along with "Background History Report Form" and "License Verification Form" attached hereto as Exhibit "A".*

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

40.     A violation of any provision of the Act, as well as any rule of the Department, is a basis for discipline.  *See* §468.3101(i), Fla. Stat.; 64E-3.011, F.A.C.

41.     It is a misdemeanor of the second degree to practice radiologic technology, or to perform the duties of a radiologist assistant, without holding an active certificate to do so. §468.311(1), Fla. Stat.

Basic Machine Operators.

42.     A Basic Machine Operator ("BMO") is the lowest level of technician who may perform X-ray services in Florida, and requires the least amount of education and testing in order to obtain certification.  *See generally* 64E-3.0031(1), F.A.C; §§468.301(1) and (9), Fla. Stat.; 468.304(3)(e)2, Fla. Stat.

43.     A BMO, unlike the other levels of technicians described in the RPCA, is defined as a person "***who is employed by a licensed practitioner*** to perform certain radiographic functions…***under the direct supervision of that practitioner***".  §468.301(1), Fla. Stat. (emphasis added).

44.     The Act further describes BMOs as being permitted to "perform general diagnostic radiographic and general fluoroscopic procedures…***under the direct supervision and control of a licensed practitioner in that practitioner's office***."  §468.302(3)(a), Fla. Stat. (emphasis added).

45.     A "licensed practitioner" is defined as "a person who is licensed or otherwise authorized by law to practice medicine, podiatric medicine, chiropody, osteopathic medicine, naturopathy, or chiropractic medicine in this state." §468.301(11), Fla. Stat.

46.     "Direct supervision" is defined as "supervision and control by a licensed practitioner who assumes legal liability for the services rendered by the basic X-ray machine

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL  32202-3646

operator…which supervision requires the physical presence of the licensed practitioner for consultation and direction of the actions of the basic X-ray machine operator…." §468.301(7), Fla. Stat.

47.      "Physical presence" means "within the facility housing the equipment used by a basic X-ray machine operator." 64E-3.002(4), F.A.C.

48.      As a result, in order to lawfully employ a BMO, the BMO must be employed by a licensed practitioner and work in that licensed practitioner's office.   In addition to these requirements, lawful use of a BMO requires the technician to be directly supervised, meaning that the licensed practitioner is present in the facility when the BMO is performing X-ray scans.

**The Health Care Clinic Act ("HCCA")**
**§§ 400.990 *et seq.*, Fla. Stat.**

49.      The HCCA requires each clinic location to obtain a license from the Agency for Health Care Administration ("AHCA").  §400.991, Fla. Stat.  In explaining the purpose of the HCCA, the Florida Legislature stated that "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers."   §400.990(2), Fla. Stat. Accordingly, the express purpose of the HCCA "is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by [AHCA]." *Id.*

50.      In furtherance of the goal of clinic oversight, the HCCA requires that clinics which are owned by non-licensed (non-medical) individuals designate a "Medical Director."  The Medical Director is required to assume several statutory obligations to ensure the safety of patients.  §400.9935, Fla. Stat.

51.     The identity of the Medical Director must be designated in the verified application for clinic licensure required by AHCA.  AHCA relies upon this designation in granting a clinic licensure at the request of a non-licensed (non-medical) clinic owner.

52.     Medical Directors must agree in writing with the provider to undertake the statutory obligations and legal responsibilities of Medical Directors identified in the HCCA. §400.9905(1), Fla. Stat.

53.     In furtherance of the goal of patient safety, the Medical Director must ensure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided.  §400.9935(1)(d), Fla. Stat.

54.     In order for a Medical Director to be compliant with the HCCA, he or she must verify the proper certification of the individuals rendering services under his or her direction.

55.     Additionally, a Medical Director must ensure that any billing for services rendered by the clinic do not contain charges that are fraudulent or unlawful.  The Medical Director is required to conduct "systematic reviews" of the clinic's billing and is required to "take immediate corrective action" should unlawful or fraudulent billing be detected. §400.9935(1)(g), Fla. Stat.

56.     During the relevant time period, B&A was (and continues to be) owned by Felipe Aguilar, a non-medical layperson.  As such, B&A was required under the HCCA to employ a Medical Director to comply with the obligations of Fla. Stat. §400.9935.

57.     As an non-medical lay person clinic owner, Aguilar was required to identify, via verified application to AHCA, the identity of the Medical Director.  AHCA requires the Medical Director be identified so that it is clear, in the interest of patient safety, who is undertaking the obligation of statutory compliance.

{29623703;4}

58.     In fact, any agreement to serve as a Medical Director that does not comply with the statutory requirements of the Health Care Clinic Act is deemed void as contrary to public policy.  *See* §400.9935(2), Fla. Stat.

59.     Further, any clinic whose Medical Director operates in violation of the Medical Director compliance statute results in unlawful charges which are noncompensable and unenforceable.  *See* §400.9935(3), Fla. Stat.

60.     From March 21, 2008 through March 31, 2010, the Medical Director designated by Aguilar, on behalf of B&A, in the verified AHCA license application was Genao.  On April 1, 2010, the individual represented to AHCA as the Medical Director was changed by B&A from Genao to its current Medical Director, Alonso M.D.  *See Application for Clinic Licensure and subsequent Change of Medical Director Form attached hereto as Exhibit "B".*

### B&A and Its Medical Directors Failed to Make a Good Faith Effort to Collect a Deductible or Copay In Violation of Fla. Stat. 817.234

61.     Fla. Stat. § 817.234 states: "It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge."  Fla. Stat. § 817.234(7)(a).

62.     The failure of a service provider, such as B&A, to make "a good faith attempt to collect such deductible or copayment" as a regular business practice constitutes insurance fraud in violation of Section 817.234 and, depending on the value of the property involved, a first to third degree felony.   *See* Fla. Stat. § 817.234(11)(a) – (c).

63.     Pursuant to the No-Fault Law, State Farm was obligated to pay 80% of all reasonable charges; the remaining 20% was the responsibility of the patient to which B&A was obligated to make a good faith effort to collect. *See* Fla. Stat. § 627.736(1)(a); § 817.234(7)(a).[3]

64.     Additionally, pursuant to the policies for insurance for each State Farm insured, a deductible must be met before State Farm's obligation to make payment is triggered.  B&A had an obligation to collect from its patients any amounts for services rendered which represented charges within that patient's deductible.

65.     Additionally, a service provider may charge an insurer "only a reasonable amount" for the services provided.  Fla. Stat. § 627.736(5)(a).  In determining a "reasonable amount," "consideration may be given to evidence of usual and customary charges and payments accepted by the provider…"  Id.

66.     A service provider shall not charge an amount for services that exceeds the amount "customarily" charged by that provider for like services.  *Id*.  Accordingly, the pattern or practice of waiving copayments or deductibles causes the bills for such charges to materially misrepresent the amount the service provider "customarily" charges or accepts for like services because, in reality, the amount submitted to the No Fault Insurer is higher than the amount the provider truly collects on like services.

67.     During the Relevant Time Period, B&A had the general business practice of waiving and/or failing to make a good faith effort to collect any copayments or deductibles from its patients thereby committing insurance fraud as defined by Fla. Stat. § 817.234(7)(a).

---

[3] It should be noted that a limited number of patients may carry the optional Medical Payments Coverage which would be responsible for any copayment obligation of the insured.
{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

68.     Upon information and belief, B&A has not collected any payments, including any payments representing copayments and/or deductibles, from any of the patients identified in this Complaint and the exhibits attached hereto.

69.     B&A's practice of failing to collect such copayments and deductibles encourages insureds to obtain medical treatment which they might have otherwise not sought by unlawfully ignoring its obligation to collect all applicable copayment and deductibles.

70.     Further, the failure of Genao and Alonso, M.D. to ensure that such copayments and deductibles were collected constituted a violation of their duty to ensure that B&A's billings were not fraudulent and/or unlawful.

**Ernesto Alvarez Valasco – Lack of Certification**

71.     Alvarez began his employment with B&A in June 2009.

72.     As part of his duties at B&A, Alvarez performed x-rays on patients, including State Farm insureds.

73.     Alvarez purportedly performed the technical component of the x-ray service, meaning, he was the individual who operated the x-ray equipment and performed the x-ray scan on patients.

74.     For each x-ray scan that Alvarez performed upon a State Farm insured, he signed the Disclosure and Acknowledgment Form required by Florida Statutes § 627.736 (5)(e).  This statutorily required form, completed at a patient's initial visit, identifies the services that are being provided, certifies that the services have been explained to the patient, and identifies the provider rendering those services. By his printed and signed name on the Disclosure & Acknowledgment Form, State Farm is able to identify that Alvarez was the individual who performed the X-ray scan on its insured.

75.     As such, Alvarez was engaged in the activity of using radiation and practicing radiologic technology on human beings.

76.     Up until November 30, 2010, Alvarez performed this service without the "certification" required by the RPCA. *See printout from Department of Health Website identifying "License Original Issue Date" for Alvarez attached hereto as Exhibit "C".*

77.     As such, Alvarez was operating x-ray equipment without the statutorily required certification for radiologic technicians in Florida.

78.     While Alvarez purports to have possessed a "certification" from the American Registry of Radiologic Technicians (ARRT), this did not obviate Alvarez's statutory requirement to undertake the certification requirements for radiologic technicians in Florida as required by law.  In fact, the AART, on its publicly available website, states that "*[t]he state, not ARRT, is the authority that administers the license and grants an individual permission to practice radiologic technology within that state.   Application for and renewal of a state license are separate from ARRT processes.*"   *See https://www.arrt.org/State-Licensing/Licensing-vs-Certification-Registration* (emphasis added).

79.     Further, without a certification from the Florida Department of Health, there is no mechanism by which the State of Florida can oversee Alvarez's conduct as a radiological technician.  Alvarez, in essence, is invisible to the regulatory agency tasked with overseeing not just his qualifications, but his compliance with applicable laws, rules and regulations and continuing education requirements (twelve hours per year in Board approved programs).

80.     Additionally, the failure to identify himself to the Department of Health insulates him from the oversight inherent to the renewal process as required by the State.  The Department of Health provides that the "[f]ailure to renew an active license before the expiration date will

result in the license being placed in an expired status.  Failure by an expired licensee to reactivate within ten years of becoming expired renders the license null and void without any further action by the board or the departments.  The renewal process requires a completed renewal application, required fees, and proof of compliance with continuing education requirements. and ongoing requirements for license renewal (biennial renewal applications are required in order to maintain the right to practice."  *See http://www.floridahealth.gov/licensing-and-regulation/radiologic-technology/renewal/requirements.html.*

81.     In essence, by not obtaining his statutorily required certification, Alvarez was able to operate "under the radar" of the State of Florida, invisible to any efforts to regulate his conduct.

82.     Alvarez also had not completed other requirements for certification, including the required HIV/AIDS course, submissions of an application, application fee, and background check.  § 468.304, Fla. Stat.

83.     Defendants  B&A, Genao, Alonso M.D. and Alvarez knew or should have known that Alvarez lacked certification from the Department of Health, as is clearly required under the RPCA.

84.     Additionally, Genao, and later Alonso M.D., as Medical Directors, failed to fulfill their respective statutory obligations to ensure that Alvarez possessed the required certification to conduct radiologic technology on B&A's patients, including State Farm's insureds.  *State Farm Fire insureds who were subjected to radiologic technology at the hands of an uncertified technician (Alvarez) are identified in Exhibit "D" and Exhibit "E" attached hereto.  (The patient names have been redacted from Exhibits D and E. An unredacted version will be provided to Defendants.)*

{29623703;4}

- 16 -

85.     Defendants B&A, Genao, Alonso M.D. and Alvarez knew or should have known that Genao and Alvarez M.D. were not compliant with the requirements for Medical Directors in Florida under the HCCA by failing to assure that Alvarez held the proper certification as a radiologic technologist for the approximate eighteen (18) months in which he unlawfully conducted x-ray scans on State Farm's insureds.

### Jose Angel Ortiz Maza – Unlawful Employment and Supervision of a Basic Machine Operator

86.     Ortiz was employed by B&A from July 2009 through November 2013.

87.     For the entirety of his employment at B&A, Ortiz held a certification from the State of Florida as a Basic Machine Operator.  *See printout from Department of Health Website identifying Ortiz as a "Basic X-ray Machine Operator" attached hereto as Exhibit "F".*

88.     For each x-ray scan that Ortiz performed upon State Farm's insureds, Ortiz purportedly performed the technical component of the x-ray service, meaning, he was the individual who operated the x-ray equipment and performed the x-ray scan on patients.

89.     For each x-ray scan that Ortiz performed upon a State Farm insured, he signed the Disclosure and Acknowledgment Form, as discussed herein and required by §627.736(5)(e), Fla. Stat.  By his printed and signed name of the Disclosure & Acknowledgment Form, State Farm is able to identify that Ortiz was the individual who performed the x-ray scan on its insured.

90.     As such, Ortiz was engaged in the activity of using radiation and practicing radiologic technology on human beings.

91.     Based upon the Disclosure and Acknowledgment Forms signed by Ortiz, Ortiz performed x-ray scans on State Farm's insureds (and others) multiple times per week, on average three (3) times per week or 12 times per month during the applicable timeframe.

92.     During the timeframe that Ortiz was employed by B&A, Medical Directors Genao and then Alonso M.D. were the only licensed practitioners employed by B&A.

93.     During this timeframe (until April 2010), Genao testified that as Medical Director at B&A:

- He did not work at B&A, as it was not his primary place of work;

- His supervision consisted of "ask[ing] for a few records…if things has been done correctly, if everything were in place";

- He was at B&A "maybe once a week, twice a week, once every two weeks";

- He "never notified them that I was going to walk in", and would "walk in whenever I felt that I had to do it"; and

- He did not "supervis[e] the procedure" as he is "not an expert on taking MRI or X-ray"

*See Excerpts of Deposition testimony of Genao, B&A Diagnostic, Inc. a/a/o Serantes v State Farm Mutual Automobile Ins. Co., May 9, 2012, attached here to as Exhibit "G".*

94.     During this timeframe (from April 2010 forward), Alonso M.D. testified that as Medical Director at B&A:

- He went to B&A only "once a month";

- He was not aware precisely how many x-ray machines B&A employed;

- Was not aware how many x-ray technicians B&A employed as he could not name a single x-ray technician employed by B&A; and

- The only technician he could recall by name was an MRI tech named "Edgar".

*See Excerpts of Deposition testimony of Alonso M.D., B&A Diagnostic, Inc. a/a/o Gonzalez v State Farm Mutual Automobile Ins. Co., April 22, 2011, attached here to as Exhibit "H".*

{29623703;4}

- 18 -

95.     As a BMO, in order to lawfully be employed to conduct x-ray services,  Ortiz was required to (1) be employed by a licensed practitioner, and (2) work in the office of that licensed practitioner.  *See* §§468.301 (1) and 468.302 (3)(a), Fla. Stat.

96.     As Ortiz was an employee of B&A only, he was not an employee of a licensed practitioner, nor was he conducting x-ray services in the office of a licensed practitioner.

97.     As such, B&A's employment of Ortiz, as it was a clinic owned by a layperson, and not the office of a licensed practitioner, was in violation of Florida law regulating the use of BMOs.

98.     As opposed to the other levels of technicians (who are not required to work for a licensed practitioner in that practitioner's office under direct supervision), BMOs are required to obtain less education and meet lower certification requirements.  However, in order to ensure patient safety, these Basic Machine Operators (as the name implies) require the physical presence of a licensed practitioner in the facility.  In fact, the BMO is the only level of technician excepted from the definition of "general radiographer" which is defined as "a person who is employed and certified in radiography, other than a basic x-ray machine operator…." §468.301(9), Fla. Stat.

99.     In order to lawfully perform x-ray services, Ortiz was required to work under the direct supervision and control of a licensed practitioner, which required the physical presence of the licensed practitioner within the facility in which the equipment being used by Ortiz was housed.  §§468.301(1), 468.302 (3)(a), Fla. Stat.; 64E-3.002 (4), F.A.C.

100.     Ortiz did not operate under the direct supervision of a licensed practitioner, as there was no licensed practitioner engaged in the "direct supervision and control" of Ortiz as required under Florida law.

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

101.    Further, even if B&A could lawfully employ a BMO under Florida law (which it cannot), Ortiz did not perform x-ray scans under the direct supervision and control of a licensed practitioner at B&A.  As such, these services were unlawfully performed.

102.    Genao and later Alonso M.D., as Medical Directors, failed to fulfill their respective statutory obligations to ensure that the bills submitted to State Farm by B&A were not fraudulent or unlawful, as the services performed by Ortiz (and Alvarez as described above) were unlawful services for which State Farm was billed.

103.    Defendants  B&A, Genao, Alonso M.D. and Ortiz knew or should have known that Ortiz, as a BMO, could not lawfully be employed by B&A, and they knew or should have known that Ortiz was conducting x-ray scans on patients without the level of supervision required under Florida law. *State Farm Fire insureds who were subjected to radiologic technology at the hands of an unlawfully employed and unsupervised BMO (Ortiz) are identified in Exhibit "I" and Exhibit "J" attached hereto.  (The patient names have been redacted from Exhibits I and J.  An unredacted version is being provided to Defendants.)*

104.    Defendants B&A, Genao, and Alonso M.D. knew or should have known that B&A, Genao and Alonso M.D. did not comply with the requirements for Medical Directors in Florida as they failed to ensure that B&A only billed for services that were lawfully and not fraudulently performed, as Ortiz was unlawfully employed and unsupervised when performing x-rays throughout his employment at B&A.

### B&A and Its Medical Directors, Genao and Alonso, M.D. Failed to Comply With Florida Law in Performing Their Duties

105.    Pursuant to the HCCA, "[e]ach clinic shall appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for the following activities on behalf of the clinic."  §400.9935(1), Fla. Stat.

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

106.     Genao, did not enter into a written agreement with B&A agreeing to accept legal responsibility for his statutory Medical Director duties.   Alonso, M.D. did not enter into an agreement with B&A until March 15, 2011, nearly one year after he was appointed B&A's Medical Director on April 1, 2010.

107.     The HCCA requires the medical director to, amongst other things, assume responsibility for:

a.      Ensuring the clinic has signs identifying the medical director or clinic director posted in a conspicuous location within the clinic readily visible to all patients;

b.      Ensuring that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license;

c.      Reviewing any patient referral contracts or agreements executed by the clinic;

**d.      Ensuring that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided;**

e.      Serving as the clinic records owner as defined in § 456.057, Florida Statute;

f.      Ensuring compliance with the recordkeeping, office surgery, and adverse incident reporting requirements of chapter 456, the respective practice acts, and rules adopted under this part and part II of chapter 408;

**g.      Conducting systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action;**

h.      Not refer a patient to the clinic if the clinic performs magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography; and

i.      Ensuring that the clinic publishes a schedule of charges for the medical services offered to patients. The schedule must include the prices charged to an uninsured person paying for such services by cash, check, credit card, or debit card. The schedule must be posted in a conspicuous place in the reception area of the urgent care center and must include, but is not limited to, the 50 services most frequently provided by the clinic.

§ 400.9935(1)(a)-(i), Fla. Stat. (emphasis added).

{29623703;4}

108.     Additionally, Florida Statute §400.9925(1) instructs AHCA to adopt rules necessary to administer the clinic administration, regulation and licensure program, which includes the Medical Director requirement.

109.     In addition to the statutory requirements of a Medical Director, the AHCA adopted rules set forth in the Florida Administrative Code that provide insight into the AHCA's intention to have a Medical Director supervise a clinic's day to day operations.  Section 59A-33.008(1), F.A.C. states:

> A licensed health care clinic **may not operate or be maintained without the day-to-day supervision** of a single medical or clinic director as defined in Section 400.9905(5), F.S.   The health care clinic responsibilities under Sections 400.9935(1)(a)-(g), F.S., cannot be met without an active, appointed medical or clinic director.  Failure of an appointed medical or clinic director to substantially comply with health care clinic responsibilities under Rule 59A-33.012, F.A.C., and Sections 400.9935(1)(a)-(g), F.S., shall be grounds for the revocation or suspension of the license and assessment of a fine pursuant to Section 400.995(1), F.S.

110.     Florida Statute § 400.9935(5) provides that, "[a]ny licensed health care provider who violates this part [listing the duties of a Medical Director] is subject to discipline in accordance with this chapter and his or her respective practice act."

111.     The purpose and spirit of this requirement was to ensure that a licensed professional was responsible so that compliance of the statute/rule was not left in the hands of a layperson.

112.     B&A and Genao, during Genao's tenure as the Medical Director at B&A from March 21, 2008 through March 31, 2010, failed to comply with the requirements for a Medical Director set forth in the HCCA.

113.   Genao failed to ensure the technicians at B&A were lawfully employed, supervised, and certified.  Genao also failed to conduct systematic reviews of B&A's billings for unlawful conduct.

114.   Genao has testified that as Medical Director at B&A:

- He did not ensure that the x-ray technicians were certified as required by § 400.9935(1)(d); in fact, he was not aware that X-ray technicians had to be certified;

- He did not conduct systematic reviews of B&A billings to ensure that they were not fraudulent or unlawful as required by §400.9935(1)(g), rather, he "assumed" it was lawful;

- He believed his only obligation as Medical Director was to "review the charts" to make sure the service conducted was the service prescribed, and if he had known what his statutory duties entailed he never would have become the Medical Director;

- He was unaware of the person at B&A in charge of radiation safety.

*See Excerpts of Deposition testimony of Genao, State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc. et al., July 10, 2014, attached here to as Exhibit "K."*

115.   B&A and Alonso, M.D., from April 1, 2010 through November 16, 2011, (while Alonso, M.D. was the Medical Director at B&A), failed to perform and comply with the requirements for a Medical Director set forth in the HCCA.

116.   Alonso, M.D. failed to ensure the technicians at B&A were lawfully employed, supervised, and certified.  Alonso, M.D. also failed to conduct systematic reviews of B&A's billings for unlawful conduct.

117.   Alonso, M.D. has testified that as Medical Director at B&A:

- He did not ensure that the X-ray technicians were certified as required by § 400.9935(1)(d); and admitted that Alvarez was performing X-rays unlawfully at B&A until November 30, 2010;

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

- He failed to comply with his statutory responsibility to ensure Alvarez was properly certified, and admitted that Alvarez was uncertified and unqualified to conduct X-rays;

- The bills and services performed by Ortiz were unlawful because Alonso, M.D. failed to ensure Ortiz was properly employed and/or supervised;

- He failed to conduct systematic reviews of the B&A billings to ensure that they were not fraudulent or unlawful as required by §400.9935(1)(g), and permitted unlawful bills for services rendered by B&A technicians to be billed;

- He did not conduct systematic reviews of B&A billings to ensure that they were not fraudulent or unlawful as required by §400.9935(1)(g), rather he "assumed" it was lawful;

- He reviewed a total of only ten (10) charts/bills per month.

*See Excerpts of Deposition testimony of Alonso, M.D., State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc. et al., June 24, 2014, attached here to as Exhibit "L."*

118.     Genao failed to provide "day-to-day" supervision of B&A in that he admittedly was present at B&A only once every two weeks for 2-3 hours.  *The State Farm insureds who were subjected to unlawful treatment during Genao's tenure as Medical Director at B&A from March 21, 2008 through March 31, 2010 are identified in Exhibit "M" and Exhibit "N" attached hereto.  (The patient names have been redacted from Exhibits M and N.  An unredacted version is being provided to Defendants.)*

119.     Genao further failed to ensure the lawfulness of B&A's billings in that he failed to ensure B&A was making a good faith effort to collect copayments and/or deductibles from its patients.

120.     Alonso M.D. failed to provide "day-to-day" supervision of B&A in that he admittedly was present at B&A only once a month during the relevant timeframe for 2-3 hours.  *The State Farm insureds who were subjected to unlawful treatment during the relevant*

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

*timeframe of Alonso's tenure as Medical Director at B&A from April 1, 2010 through November 16, 2011 are identified in Exhibit "O" and Exhibit "P" attached hereto. (The patient names have been redacted Exhibits O and P. An unredacted version is being provided to Defendants.)*

121.    Alonso, M.D. further failed to ensure the lawfulness of B&A's billings in that he failed to ensure B&A was making a good faith effort to collect copayments and/or deductibles from its patients.

122.    Defendants B&A, Genao and Alonso M.D. knew or should have known that Genao and Alonso, M.D. were not compliant with the requirements for Medical Directors in Florida under the HCCA.

### The Services Rendered Were Unlawful and Therefore Non-Compensable

123.    B&A took an "Assignment of Benefits" from State Farm's insureds so that it could directly bill State Farm for services and treatments allegedly lawfully rendered to these patients.

124.    Despite the fact that Alvarez lacked the required certification to perform radiologic technology on State Farm's insureds, that Ortiz was unlawfully employed and supervised at B&A, and that Genao and Alonso, M.D. failed to lawfully perform their duties as Medical Directors of B&A, Defendants submitted or caused to be submitted bills for reimbursement to State Farm on CMS-1500 forms which constituted representations that services were rendered to the subject patients, and that such services were lawfully provided and that "the services listed [in the forms submitted to State Farm] were medically indicated and necessary to the health of this patient and were personally furnished by me [i.e., signing provider] or my employee under my personal direction". *See Exemplar CMS-1500 form, attached here to as Exhibit "Q".*

{29623703;4}

- 25 -

125.     The CMS-1500 forms were submitted by or on behalf of B&A to State Farm for payment with corresponding records certified by Defendants to be true and correct.

126.     In reliance upon the CMS-1500 forms submitted by or on behalf of Defendants, that the treatment was lawfully rendered and performed by appropriately certified, employed and supervised personnel, State Farm paid in excess of $1.5 million as indicated on Exhibits "D," "I," "M," and "O."

127.     Further, Defendants have submitted additional bills to State Farm totaling approximately $743,025.00 which have not yet been paid, as indicated in Exhibits "E," "J," "N," and "P."

128.     As Alvarez lacked the statutorily required certification to perform the radiologic technology on State Farm's insureds prior to November 30, 2010, the charges for x-ray services to State Farm were non-compensable pursuant to Florida Statutes §§627.736 (1)(a), (5)(b)(1)(b), (5)(b)(1)(d) and (5)(d).

129.     As Ortiz was unlawfully employed and was conducting x-ray scans without the lawfully required level of supervision, the charges for x-ray services to State Farm were non-compensable pursuant to Florida Statutes §§627.736 (1)(a), (5)(b)(1)(b), (5)(b)(1)(d) and (5)(d).

130.     As Genao from March 21, 2008 through March 31, 2010 and then Alonso M.D. from April 1, 2010 through November 16, 2011 did not comply with their statutorily required duties as Medical Directors, the charges for all services billed to State Farm were unlawful and non-compensable pursuant to Florida Statutes §§627.736 (1)(a), (5)(b)(1)(b), (5)(b)(1)(d) and (5)(d), § 400.9935(1)(a)-(i) and (3).

131.     Defendants B&A, Alvarez, Genao and Alonso M.D. each participated in a scheme to evade the certification requirements of the RCPA and are jointly and severally liable for

restitution to State Farm Fire for the payments made by State Farm Fire based on their unlawful submission of claims for services rendered unlawfully by Alvarez while he was not lawfully certified.

132.    Defendants B&A, Ortiz, Genao and Alonso M.D. each participated in a scheme to evade the supervision requirements of the RCPA and are jointly and severally liable for restitution to State Farm Fire for the payments made by State Farm Fire based on their unlawful submission of claims for services rendered unlawfully by Ortiz.

133.    Defendants B&A, Genao and Alonso M.D. each participated in a scheme to evade the Medical Director requirements of the HCCA and are jointly and severally liable for restitution to State Farm for the payments made by State Farm based on their unlawful submission of claims for services rendered while they were the appointed Medical Directors at B&A.

134.    As such, State Farm is entitled to recover all amounts paid to Defendants as set forth in Exhibits "D," "I," "M," and "O.", and a declaratory judgment confirming that State Farm is not obligated to pay any of the unpaid amounts for which Defendants have billed State Farm as set forth in Exhibits "E," "J," "N" and "P.", and additional relief against Defendants as requested below.

135.    Until December 2010, individuals at State Farm were not aware that Alvarez was unlawfully conducting scans on its insureds, having relied on the CMS 1500 forms submitted that the services were lawfully rendered.

136.    Until early 2012, individuals at State Farm were not aware the Defendants were unlawfully utilizing a Basic Machine Operator to conduct x-ray scans, having relied on the CMS 1500 forms submitted that the services were lawfully rendered. State Farm has retained the

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

undersigned firm as its legal counsel in this matter and is obligated to pay the undersigned firm's costs and reasonable attorney's fees.

137.     Until mid-2014, individuals at State Farm were not aware that B&A, Genao and Alonso, M.D. had failed to properly perform their statutorily required duties as Medical Directors at B&A, and were unaware that B&A had a general business practice of waiving (or making no effort to collect) copayments and deductibles from its PIP patients.

138.     All conditions precedent to the filing of this Amended Complaint have been satisfied, excused and/or waived.

<u>**Count I – Unjust Enrichment**</u>

139.     State Farm incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 138 above.

140.     State Farm unwittingly conferred benefits on Defendants by making payments to them  pursuant to unlawful and false claims for PIP benefits for its insureds in the amounts listed in Exhibits "D", "I", "M" and "O."

141.     Defendants voluntarily accepted and retained these benefits from State Farm, despite their knowledge that the services purportedly rendered by them were not "lawfully provided" as required by Florida law.

142.     Defendants retention of these benefits was and is wrongful, as these monies were obtained for purported health care services provided by a healthcare provider that were not only in violation of applicable Florida law, but performed in such a manner that disregarded the very administrative oversight designed to protect not just State Farm insureds, but the public as a whole.

143.     Defendants' disregard of the certification requirements for x-ray technicians in Florida, the employment and supervision requirements for BMOs, their lawful obligation to

{29623703;4}

- 28 -

collect copayments and/or deductibles from the insureds, as well as the obligations and duties of Medical Directors described herein, demonstrates a pattern of not only unlawful (and therefore noncompensable) provision of medical services, but of placing a desire to bill over concern for the safety and well-being of patients.

144.    B&A engaged in a pattern and practice of billing and collecting its patients' insurance benefits while disregarding a myriad of Florida Statutes and Administrative Code provisions designed to protect these same Florida patients.

145.    State Farm has been harmed by Defendants' wrongful actions because State Farm would not have paid the amounts listed in Exhibits "D," "I," "M," and "O"  if it had been known at the time these claims were paid that the services were not provided pursuant to Florida law and, accordingly, were not reimbursable pursuant to Florida law.

146.    It would be unjust under these circumstances to allow Defendants to continue to retain these benefits despite their misconduct.

WHEREFORE, State Farm Fire and Casualty Company respectfully request this Court to enter judgment in its favor and award damages, interest and costs as follows:

- A Judgment in favor of State Farm Fire and against B&A, Alvarez, Genao and Alonso, M.D., jointly and severally, in the amounts identified in Exhibit "D";

- A Judgment in favor of State Farm Fire and against B&A, Ortiz, Genao and Alonso, M.D., jointly and severally, for the amount identified on Exhibit "I";

- A Judgment in favor of State Farm and against B&A and Genao, jointly and severally, for the amount identified in Exhibit "M";

- A Judgment in favor of State Farm and against B&A and Alonso, M.D., jointly and severally, for the amount identified in Exhibit "O"; and

- any other relief as the Court deems just and proper.

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL 32202-3646

**Count II – Declaratory Relief Pursuant to Chapter 86, Fla. Stat.**

**(State Farm Mutual Automobile Insurance Company and State Farm
Fire and Casualty Company Against Defendant B&A)**

147.    State Farm incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 138 above.

148.    There is an actual case and controversy between State Farm and B&A as to the charges submitted to State Farm by B&A for unlawful services which have not been paid, as set forth on Exhibits "E," "J," "N," and "P" above.

149.    B&A has engaged in an unlawful and dangerous practice of allowing Alvarez, an uncertified individual, to conduct its x-ray scans with respect to State Farm's insureds, as well as unlawfully employing and failing to properly supervise a BMO who was conducting x-ray scans of unwitting patients.

150.    B&A also failed to properly appoint a Medical Director that complied with the duties and obligations of the HCCA and Florida law.

151.    B&A has engaged in an unlawful and dangerous practice of allowing individuals to serve as statutorily required Medical Directors without requiring them to undertake the obligation to ensure the proper certification of the individual conducting x-ray scans with respect to State Farm's insureds,  without ensuring that B&A was billing for services that were lawfully rendered, without providing day-to-day supervision at B&A, and/or without providing sufficient oversight of B&A.

152.    Alvarez has engaged in an unlawful and dangerous practice of performing x-ray scans on State Farm's insureds without obtaining the required certification under the Florida Statutes and Administrative Code.

{29623703;4}

AKERMAN LLP, 50 NORTH LAURA STREET, SUITE 3100, JACKSONVILLE, FL  32202-3646

153.    Ortiz has engaged in an unlawful and dangerous practice in failing to be employed by a licensed practitioner in the office of a licensed practitioner and conducting x-ray scans without the direct supervision and control required under Florida law.

154.    B&A and its Medical Directors have engaged in the unlawful business practice of waiving or making no effort to collect the copayments or deductibles from any of its patients.

155.    The Medical Directors at B&A have engaged in the unlawful and dangerous practice of failing to comply with the express statutory obligations of Medical Directors designed to ensure the health and safety of patients.

156.    As a result, none of the services for which B&A submitted bills to State Farm, as set forth on Exhibits "E," "J," "N," and "P" were "lawfully rendered" as required for B&A to seek or obtain reimbursement for these purported services pursuant to §627.736 and §400.9935, Fla. Stat.

157.    Accordingly, State Farm respectfully requests a declaration that: (a) State Farm is not obligated to pay any of the amounts set forth in Exhibits "E," "J," "N," and "P" to B&A; and (b) State Farm is not obligated to pay claims that have or may be submitted for services provided by B&A with dates of service between March 21, 2008 through November 16, 2011.

WHEREFORE, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company respectfully request judgment declaring the rights of the parties, award costs as this Court may deem equitable and any supplementary relief the Court deems just and proper.

Dated: November 19, 2014

    /s/ David I. Spector

David I. Spector (Fla. Bar No. 086540)
david.spector@akerman.com
Sandra L. Heller (Fla. Bar No. 037055)
Florida Bar No. 037055
sandra.heller@akerman.com
Nicholas J. Purvis (Fla. Bar No. 054268)
nicholas.purvis@akerman.com
**AKERMAN LLP**
50 North Laura Street
Suite 3100
Jacksonville, Florida 32202.3646
Phone: (904) 798.3700
Facsimile: (904) 598.3913

*Counsel for State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company*

{29623703;4}