UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE  NO: 14-CV-24387-MOORE/MCALILEY

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and
STATE FARM FIRE & CASUALTY
COMPANY,

      Plaintiff,

vs.

B&A DIAGNOSTIC, INC. n/k/a OASIS
MEDICAL CENTER CORP., ESTEBAN GENAO, M.D.,
ALEX ALONSO, M.D., ERNESTO ALVAREZ
VELASCO and JOSE ANGEL ORTIZ MAZA,

      Defendants.

_____/

## STATE FARM'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL DEFENDANTS AS TO COUNT I AND COUNT II OF STATE FARM'S COMPLAINT WITH MEMORANDUM OF LAW IN SUPPORT

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Plaintiffs, State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively "State Farm"), pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1, move for Summary Judgment against Defendants, B&A Diagnostic, Inc. n/k/a Oasis Medical Center Corp. ("B&A"), Esteban Genao, M.D. ("Dr. Genao"), Alex Alonso, M.D. ("Dr. Alonso") and Ernesto Alvarez Velasco ("Alvarez")[1] as to Counts I and II of State Farm's Complaint [ECF No. 1], and state:

## I.    <u>INTRODUCTION</u>

This action arises out of claims for auto insurance benefits submitted by B&A for purported diagnostic services that were unlawfully rendered to obtain insurance payments from State Farm Mutual and State Farm Fire. Between March 21, 2008 and November 16, 2011 (the "Relevant Time Period"), B&A submitted bills to State Farm for services that were unlawfully rendered and therefore noncompensable. In order for these services to be compensable under section 627.730 *et. seq*., Fla. Stat. (Florida's "No-Fault Law"), the services must be lawfully rendered, which means being in substantial compliance **with all relevant** applicable criminal, civil, and administrative requirements of State and Federal law related to the provision of medical services or treatment. Fla. Stat. §§ 627.736(1)(a), (5)(b)(1)(b), (5)(b)(1)(d), 627.732(11), 400.9935(3); *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Center of Florida, Inc.*, --- F.Supp. 3d---, Case No. 14–20625–KMM, 2015 WL 2170396, *8, FN 9 (S.D. Fla. May 8, 2015) (citing *State Farm Fire & Casualty Company v. Silver Star Health and Rehab*, 739 F.3d 579, 582-84 (11th Cir. 2013)).

As set forth in detail in State Farm's Statement of Facts [ECF No. 122], B&A, a layperson-owned clinic, was operating in violation of numerous Florida laws, rules and regulations promulgated specifically to protect the general welfare of its patients and the public. Despite holding out to the State of Florida that it employed a legally compliant Medical Director who supervised the day-to-day operations of B&A and ensured that the services billed for were not unlawful or fraudulent (amongst other duties), in truth, the Medical Directors allowed B&A to improperly and unlawfully operate on a host of levels. This unlawful conduct included employing uncertified X-ray technicians, unlawfully employing and supervising low level X-ray technicians, failing to supervise the day-to-day activities of B&A, as well as engaging in business practices which constitute "insurance fraud" as defined by Florida law.

---

[1] Jose Ortiz Maza was voluntarily dismissed from this action on April 14, 2015. [ECF No. 34].

While each of these unlawful acts renders the services non-compensable in their own right, the Medical Director's non-compliance is a global basis for State Farm's claim that all the services performed during the Relevant Time Period were unlawfully rendered. In fact, these Medical Directors, by their own admission, had absolutely no understanding of the legal requirements of a Medical Director under Florida law, and failed to educate themselves as to what those duties entailed. Indeed, the record reflects that there is no genuine issue of material fact that Medical Directors, Dr. Genao and then Dr. Alonso, failed to perform the most basic requirements of a Medical Director for B&A and are responsible for the blatant and continuous violations of Florida law described herein. Accordingly, none of the services rendered by B&A were lawful or compensable, and State Farm is entitled to restitution for the insurance benefits paid to B&A for the benefit of the Defendants.

The unlawful and noncompensable services rendered by Defendants at B&A can be broken down into five (5) categories:

- Services Related to Insurance Fraud For Failure to Collect Copayments and Deductibles: During the Relevant Time Period, B&A committed systemic "insurance fraud", as B&A engaged in the general business practice of failing to make a good faith attempt to collect deductibles and/or copayments from its patients in violation of Fla. Stat. § 817.234(7)(a) and §627.736(5)(a) The impacted claims are set forth on Exhibits D, E, I, J, M, N, P, Q to State Farm's Complaint [ECF No. 1-10] [ECF No. 1-11] [ECF No. 1-15] [ECF No. 1-16] [ECF No. 1-19] [ECF No. 1-20] [ECF No. 1-21] [ECF No. 1-22];

- Services Rendered by Alvarez: From June 2009 through November 30, 2010, Alvarez unlawfully conducted X-rays at B&A, including on the State Farm Fire insureds at issue in this case[2], without the mandated certification from the Florida Department of Health in violation of Florida law The impacted claims are set forth on Exhibits D, E of State Farm's Complaint [ECF No. 1-4] [ECF No. 1-5];

- Services Rendered by Ortiz: From July 2009 through November 2011, Ortiz, a Basic Machine Operator, unlawfully conducted X-rays at B&A, including on State Farm Fire insureds at issue in this case, as he was not employed by a licensed practitioner in that licensed practitioner's office, and was not "directly supervised" by a licensed practitioner as required by Florida law. The impacted claims are set forth on Exhibits I and J of State Farm's Complaint [ECF No. 1-15] [ECF No. 1-16];

- Services Rendered During Dr. Genao's Tenure: During Dr. Genao's tenure as Medical Director at B&A, from March 21, 2008 through March 31, 2010 (the "Genao Era"), Dr. Genao and B&A did not comply with the Medical Director requirements delineated under

---

[2] The discreet issue concerning the services rendered by Alvarez and Ortiz on State Farm ***Mutual*** insureds was litigated in a prior litigation.

Florida law. The impacted claims are set forth on Exhibits M and N to State Farm's Complaint [ECF No. 1-19] [ECF No. 1-20]; and

- <u>Services Rendered During Dr. Alonso's Tenure</u>: Likewise, during Dr. Alonso's tenure as Medical Director at B&A, the relevant portion of which extends from April 1, 2010 through November 16, 2011, (the "Alonso Era"), Dr. Alonso and B&A did not comply with the applicable Medical Director requirements delineated under Florida law. The impacted claims are set forth on Exhibits O and P to State Farm's Complaint [ECF No. 1-21] [ECF No. 1-22].

As a result of Defendants' submission of bills for these unlawful services to State Farm insureds, State Farm paid to B&A, for the benefit of all Defendants, $1,478,848.40 for the unlawful services identified on Exhibits D, I, M and O to the Complaint. Furthermore, B&A has billed State Farm an additional $697,970.00 for the unlawful claims identified on Exhibits E, J, N and P to the Complaint that remain unpaid.

State Farm has asserted two counts against B&A in its Complaint: (1) unjust enrichment to recover the $1,478,848.40 in payments it made to B&A for the unlawful and noncompensable services billed to State Farm identified in Exhibits D, I, M and O to the Complaint; and (2) a request for a declaratory judgment holding that State Farm does not owe the $697,970.00 in bills received from B&A that remain unpaid for the services purportedly rendered during the Relevant Time Period identified in Exhibits E, I, O and P.

Florida law is well-settled that a cause of action for unjust enrichment exists where a medical provider, such as here, accepts and retains a benefit "that it is not legally entitled to receive in the first place." *Silver Star*, 739 F.3d at 584; *see also Med. Serv. Center*, 2015 WL 2170396 at *9 (granting summary judgment on unjust enrichment claim and stating that it would be inequitable to allow defendants to retain benefits for unlawfully rendered services "regardless of whether those services were medically necessary.") No genuine issue of material fact exists (as B&A does not dispute) that Alvarez was not certified at the time he performed the subject X-rays, and that Ortiz was not properly employed and was not properly supervised as required by Florida Statute. Further, no genuine issue of fact remains that B&A was engaged in the "general business practice" of waiving--or failing to make a good-faith effort to collect--copayments and/or deductibles from its patients, as B&A admits that it has not made a *any* effort to collect (and has not collected) a single copayment or deductible from the thousands of State Farm insureds it serviced, including the nearly 5,000 services identified in the Complaint. Finally, no genuine issue of material fact exists that B&A and its Medical Directors failed to ensure that the

- 4 -

billing from B&A was not unlawful or fraudulent, and to otherwise comply with the statutory requirements under Florida law during the relevant time period.

## II.    THE RELEVANT PARTIES AND PLAYERS

B&A is a Florida Corporation in the business of providing X-ray and MRI services to patients in Miami, Florida. B&A submits medical bills to State Farm for diagnostic services purportedly rendered to State Farm's insureds. At least half (if not more) of B&A's billing is directed to automobile insurance carriers and seeks payments for personal injury protection insurance benefits. [ECF No. 122] at ¶¶1-3. B&A was owned during the Relevant Time Period by Felipe Aguilar "Aguilar", a layperson. [ECF No. 122] at ¶8.

Alvarez was employed by B&A from June 2009 through November 30, 2010 to perform X-ray scans on B&A patients. [ECF No. 122] at ¶4. Ortiz was employed by B&A from approximately July 2009 through on or after November 16, 2011 to perform X-ray services for B&A. [ECF No. 122] at ¶7. Dr.[3] Genao served as the statutorily designated Medical Director of B&A for the relevant time period of March 21, 2008 through March 31, 2010 [ECF No. 122] at ¶5, and Dr. Alonso has served as the statutorily designated Medical Director of B&A from April 1, 2010 through the present. [ECF No. 122] at ¶6.

## <u>MEMORANDUM OF LAW</u>

## III.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56, Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Med. Serv. Center* Case No. 14–cv–20625–KMM, 2015 WL 2170396, *4 (S.D. Fla. May 8, 2015) (citing Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue of material fact.'" *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

---

[3] Dr. Genao's Medical License was revoked by the Florida Department of Health on February 14, 2011 due to the unlawful and unlicensed practice of medicine.  [ECF No. SF] at ¶5, fn. 1.

"The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Williams Island Synagogue, Inc. v. City of Aventura*, 358 F. Supp. 2d 1207, 1213 (S.D. Fla. 2005) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553). "On a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable." *Office of Thrift Supervision v. Paul*, 985 F.Supp. 1464, 1470 (S.D. Fla. 1997) (citing *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990) (affirming district court's summary judgment order as to plaintiff)). "Only upon such a showing does the burden shift to plaintiff regarding that affirmative defense." *Id*. (citations omitted). "The reason is that the defendant bears the burden of proof on his affirmative defenses at trial." *Id*. (citing *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550-51 (11th Cir. 1990)).

## IV.   FLORIDA'S NO-FAULT LAW: SERVICES MUST BE LAWFUL TO BE COMPENSABLE.

Florida's No-Fault Law requires $10,000.00 in mandatory coverage for Florida automobile policy holders called Personal Injury Protection coverage ("PIP"), and provides victims of motor vehicle accidents benefits for 80% of reasonable, necessary, related and lawful treatment irrespective of fault. Fla. Stat. § 627.730 *et seq*. Florida Statute §627.736 (1)(a) sets forth what benefits **shall** be covered under PIP. (Emphasis added). This section states in pertinent part that "...*the medical benefits* **shall** *provide reimbursement only for such services and care that are* **lawfully provided, supervised, ordered or prescribed**...". Fla. Stat. §627.736 (1)(a) (emphasis added). Florida's No-Fault Law further provides that "[a]n insurer is not required to pay a claim or charges for any service or treatment **that was not lawful at the time rendered**." Fla. Stat. §627.736 (5)(b)(1)(b) (emphasis added); *see also Med. Serv. Center*, Case No. 14–cv–20625–KMM, 2015 WL 2170396, *1 (S.D. Fla. May 8, 2015) (Florida law "provides that an insurer is required to provide reimbursement to health care clinics only for medical benefits that are 'lawfully provided.' ").

"Lawful" or "lawfully" means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment. Fla. Stat. §627.732 (11). Florida's No-Fault Law also provides

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

that "[n]o statement of medical services may include charges for medical services of a person or entity that performed such services *without possessing the valid licenses required to perform such services*." Fla. Stat. §627.736 (5)(d) (emphasis added). The Statute provides further that "[a]n insurer is not required to pay a claim or charges for any service or treatment, bill or statement that *does not substantially meet the applicable requirements of paragraph (d).*" Fla. Stat. §627.736(5)(b)(1)(d) (emphasis added).

## V. THE SERVICES RENDERED DURING THE RELEVANT TIME PERIOD WERE UNLAWFUL AND THEREFORE NONCOMPENSABLE

### A. OVERVIEW OF THE APPLICABLE LAW

#### 1. Pursuant to §817.234(7), Florida Statutes

In 2003, the Florida Legislature enacted the Florida Motor Vehicle Insurance Affordability Reform Act (the "Reform Act"). *See* Reform Act, Ch. 2003-411, § 1, 10, at pp. 2-3, 31, Laws of Fla. [4] [ECF No. 118-5] As part of the Reform Act, the Legislature found and declared that "…the goals behind the adoption of the no-fault law in 1971…have been significantly compromised due to the fraud and abuse that has permeated the PIP insurance market." *Id*. at §1(c), p. 2.  The Legislature further declared that:

> (g) It is further a matter of great public importance that, in order to protect the public's health, safety, and welfare, it is necessary to enact the provisions contained in this act in order to prevent PIP insurance fraud and abuse and to curb escalating medical, legal, and other related costs, and the Legislature finds that the provisions of this act are the least restrictive actions necessary to achieve this goal.
>
> (h) Therefore, the purpose of this act is to restore the health of the PIP insurance market in Florida by addressing these issues, preserving the nofault system, and realizing cost-savings for all people in this state.

*Id*. at §1(g), (h), p. 3. In fact, the Reform Act declared that "[m]otor vehicle insurance fraud and abuse…has increased premiums for consumers and must be uncovered and vigorously prosecuted." *Id*. at §1(d), p. 3.

In order to protect the public and reduce insurance fraud and abuse, the Reform Act amended section 817.234, Florida Statutes, to include subsection (7), which makes it a crime for a provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, copayments and deductibles from PIP patients. *Id*. at §10, p. 32. Section 817.234(7)(a) states:

---

[4] The Reform Act was enacted on July 11, 2003 and became effective on October 1, 2003.  *Id*. at §22, p. 42.

**It shall constitute *a material omission and insurance fraud***, punishable as provided in subsection (11)[5], for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, **or does not for any other reason intend to collect the total amount of such charge**. With respect to a determination as to whether a service provider has engaged in such general business practice, consideration shall be given to evidence of **whether the physician or other provider made a good faith attempt to collect such deductible or copayment**.

*Id*. The clear intention of this provision is to require providers to charge an amount that truly reflects what it intends to collect with the co-payment portion, rather than "up-charge" the amount to compensate for the portion it never intends to collect from its patient. Further, it is certainly conceivable that by charging $650.00 for a cervical x-ray (which B&A has done in this case [ECF No. 118-6] at p.8 ), a patient's 20% co-payment of $130.00 may be a deterrent to that patient treating at B&A[6]. To engage in this statutorily prohibited conduct shifts this payment burden to the insurance carrier, as well as to those premium paying members of society, which is clearly the type of "*PIP insurance fraud and abuse*" referenced above.

2.    Section 627.736(5)(a), Florida Statutes

In addition to § 817.234, the general business practice of waiving copayments or deductibles from PIP patients is also a practice in violation of Florida's No-Fault Law.  The No-Fault Law states a service provider may charge an insurer "only a reasonable amount" for the services provided. Fla. Stat. §627.736(5)(a). In determining a "reasonable amount," "consideration may be given to evidence of usual and customary charges and payments accepted by the provider..." *Id*. "In no event…may such a charge be in excess of the amount the person or institution customarily charges for like services or supplies" *Id*. Accordingly, the pattern or practice of waiving copayments or deductibles causes the bills for such charges to materially misrepresent the amount the service provider "customarily" charges or accepts for like services because, if the provider has no intention to collect the 20% copayment or deductible, the amount submitted to the insurer is 20% higher than the amount the provider customarily (or ever) collects (or intends to collect) on like services.  *See Motion X-Ray, Inc. v. State Farm Mut. Auto. Ins. Co.*, 10 Fla. L. Weekly Supp. 346a, pp. 10-12 (Fla. 9th Cir. Ct. 2002) (granting summary

---

[5] Subsection 11 states that if the value of the property exceeds $100,000, the offender commits a felony of the first degree. *Id*., which is exceeded in this case.

[6] Worth noting, CPT Code 72052, which represents a cervical x-ray, carries a reimbursement under Medicare of $81.03. https://www.cms.gov/apps/physician-fee-schedule/search/search-results.aspx?Y=9&T=0&HT=0&CT=2&H1=72052&C=11&M; [ECF No. 118-7].

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

judgment in favor of insurer because provider's practice of waiving copayments and deductibles misrepresented the costs of its services and resulted in a deceptive bill in violation of §627.736(5)(a), Florida Statutes)). Accordingly, Defendants' bills to State Farm misrepresented the amount it customarily collects and were therefore not compensable. Fla. Stat. §627.736(5)(a).

### B. B&A AND ITS MEDICAL DIRECTORS MADE NO EFFORT TO COLLECT COPAYMENTS OR DEDUCTIBLES FROM THE PATIENTS.

B&A and its Medical Directors, Drs. Genao and Alonso, have admitted that they had no awareness of any statutory obligation on the part of B&A to collect co-payments or deductibles from its patients for whom PIP benefits were billed, nor did they play any role in the collection of co-payments of deductibles. There is no dispute that B&A and its Medical Directors made *no effort*, much less a "good-faith effort," to collect copayments or deductibles on any one of the nearly 5,000 separate services it billed State Farm for the PIP benefits of its insureds during the Relevant Time Period[7]. [ECF No. 122] at ¶¶10-12,47,53. In fact, B&A has admitted that it made no effort to charge or collect a single copayment or deductible from any of the thousands of State Farm insureds it has treated since 2007. [ECF No. 122] at ¶¶14-16,18. Despite the acknowledged application of both co-payments and deductibles to B&A's patients, there is no evidence to support that B&A has ever attempted to collect a copayment or deductible from any PIP insured it has treated from its inception in 2007 through the present. [ECF No. 122] at ¶16-17.

Rather, it was Aguilar that the Defendants contend was responsible for charging and collecting copayments and deductibles, with nothing more to point to than a passing reference on an intake form to a patient's responsibility to pay their statutory portion. [ECF No. 122] at ¶13. However, Aguilar, both in his individual capacity and as corporate representative of B&A, could not identify one instance that B&A has charged or collected a single copayment or deductible, nor could he identify any specific instance that B&A has made an "effort" to collect a copayment or deductible. [ECF No. 122] at ¶14,16.

 B&A had an obligation to collect the 20% co-payments for all of the insureds at issue, with the small exception of those who had additional Medical Payment Coverage ("MPC").[8] [ECF No. 93-1] at number 2, (p.2).  Specifically, of the $1,478,848.40 State Farm paid in this

---

[7] B&A also admitted in a previous litigation that it made no efforts to collect a copayment or deductible on any of the more than 1,000 State Farm insureds at issue in that lawsuit. [ECF No. 122] at ¶18

[8] MPC is an optional coverage available to insureds which, among other things, covers the co-payment or deductible amounts that are otherwise the obligations of the insured.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

case, $1,411,886.24 was paid to B&A for claims which B&A had an obligation to but failed to collect a co-payment or deductible.  (Compare [ECF No. 93-1] at number 2, (p.2).and [ECF No. 1-10] [ECF No. 1-15] [ECF No. 1-19] [ECF No. 1-21]) Unequivocally, B&A's waiver (or failure to make an effort to collect) a single co-payment or deductible from any State Farm insured was insurance fraud under Florida law.

Accordingly, pursuant to Fla. Stat. §817.234(7)(a), B&A has committed "insurance fraud" and the charges it submitted to State Farm during the Relevant Time Period as set forth in Exhibits D, E, I, J, M, N, O and P are unenforceable and noncompensable.  Fla. Stat. §627.736 (5)(b)(1)(b).

## VI.   THE SERVICES RENDERED BY ALVAREZ DURING THE RELEVANT TIMEFRAME WERE UNLAWFUL

### A.   OVERVIEW OF THE APPLICABLE LAW

The Radiological Personnel Certification Act ("RCPA"), set forth in Fla. Stat. §§ 468.3001 et seq. and Chapter 64E of the Florida Administrative Code ("F.A.C."), governs the use of radiation and radiation-emitting equipment in Florida.  Fla. Stat. §§468.3001 *et seq*. (2009-2011). It is the declaration of the RPCA to protect:

> the health and safety of the people … against the harmful effects of excessive and improper exposure to ionizing radiation.  Such protection can in some major measure be accomplished by *requiring adequate training and experience of persons who use radiation and radiation-emitting equipment* in each particular case under the specific direction of licensed practitioners.  It is the purpose of this part to establish standards of education, training, and experience and to *require the examination and certification of users of radiation and radiation-emitting equipment.*"

Fla. Stat. §468.003 (emphasis added.) Under the RPCA, "a person may not use radiation or otherwise practice radiologic technology or any of the duties of a radiologist assistant on a human being unless he or she: (b) *Is the holder of a certificate*, as provided in this part, and is operating under the direct supervision or general supervision of a licensed practitioner in each particular case".  Fla. Stat. § 468.302(1) (emphasis added); *see also* Fla. Stat. §468.302(4) (noting that only "[a] person *holding a certificate* as a radiologic technologist…." may use radiation.) In fact, it is a criminal offense to practice radiologic technology without holding an active certificate from the DOH to do so. Fla. Stat. §468.311(1).

"Certificate" is specifically defined under the RCPA to mean "certification granted and issued by the [Florida Department of Health]."  Fla. Stat. §468.301(3), (6). "Radiologic technologist" is defined as a "person, other than a licensed practitioner, who is qualified by

education, training, or experience, as more specifically defined in s. 468.302 (3) (d) – (g), to use radiation on human beings under the specific direction and general supervision of a licensed practitioner in each particular case." Fla. Stat. §468.301(15). "Licensed practitioner" for purposes of the RPCA is defined as a "person who is licensed or otherwise authorized by law to practice medicine, podiatric medicine, chiropody, osteopathic medicine, naturopathy, or chiropractic medicine in this state." Fla. Stat. §468.301(11).

The F.A.C. requires that non-physician operators of medical x-ray systems **shall be certified** in accordance with Chapter 64E-3.  *See* 64E-5.502(1)(a)(2), F.A.C. (emphasis added). Chapter 64E-3 requires that radiologic technologists seek certification *from the Board* prior to rendering radiologic technology on patients. 64E-3.003; 64E-3.004; 64E-3.006, F.A.C.

The certification process includes much more than the completion of an examination, but also: (1) identification of the technician to the Department for ongoing monitoring including renewals and continuing education; (2) submission of an application fee; (3) providing proof of appropriate educational credentials, (4) good moral character, and appropriate age; (5) completion of questions pertaining to any prior certifications,criminal history and discipline history; (6) along with the proof of completion of an HIV/AIDS course. Fla. Stat. § 468.304 (setting forth mandated criteria for certification). A violation of any provision of the RCPA, as well as any rule of the DOH, is a basis for discipline. *See* Fla. Stat. §468.3101(i); 64E-3.011, F.A.C. It is a crime to practice radiologic technology, or to perform the duties of a radiologist assistant, without holding an active certificate to do so. Fla. Stat. §468.311(1).

### B.   ALVAREZ VIOLATED THE RCPA AS HE PRACTICED RADIOLOGIC TECHNOLOGY IN FLORIDA WITHOUT HOLDING AN ACTIVE CERTIFICATE FROM THE DEPARTMENT OF HEALTH.

There is no dispute that:

- Alvarez began radiating patients at B&A in June 2009 [ECF No. 122] at ¶19;
- Alvarez did not receive his certification from the Florida Department of Health until November 30, 2010, having not applied until October 18, 2010. [ECF No. 122] at ¶20;
- Alvarez performed the X-rays identified on Exhibits D and E of the Complaint on State Farm Fire insureds [ECF No. 122] at ¶25;
- Alvarez performed the X-rays identified on Exhibits D and E of the Complaint prior to his certification from the DOH on November 30, 2010 [ECF No. 122] at ¶25;
- Alvarez continued to perform X-rays at B&A after "becoming aware" in October 2010 that he was uncertified as required by law; [ECF No. 122] at ¶¶27,29;
- State Farm became generally aware of the issue of Alvarez's lack of certification in December 2010.  [ECF No. 122] at ¶30.

Accordingly, each X-ray performed by Alvarez was a criminal act. Fla. Stat. §468.311(1). Alvarez's lack of certification was no small oversight, rather, it was the result of an intentional and willful disregard by Alvarez, B&A and B&A's Medical Directors of the requirements for certification under Florida law. In fact, no one affiliated with B&A, including Aguilar, Alvarez or either of the Medical Directors during Alvarez's tenure attempted to verify Alvarez's certification.  [ECF No. 122] at ¶¶19,23,26,48,52,55,57,58,59.

Without certification from the Florida Department of Health, Alvarez was invisible to the State of Florida, not subject to any oversight or ongoing regulation. While Alvarez operated on the inaccurate belief that certification from the American Registry of Radiologic Technologists ("ARRT"), which served only to exempt him from repeating a knowledge based examination[9], was sufficient, there is no dispute that the certification process involves much more than the passing of the examination. It is undisputed that the certification process involves: identification of a technician to the State, completion of an application with information as to educational qualification and background information, criminal history information, background screening, disclosure of any prior discipline, completion of an HIV course, compliance with renewal requirements and payment of a fee to the State. Fla. Stat. §468.304(3) and 468.3065. As Alvarez and the Medical Directors have explicitly acknowledged, the Florida Department of Health and the ARRT have made it abundantly clear that certification from the State of Florida is required to lawfully expose patients to ionizing radiation. [ECF No. 122] at ¶¶ 21,22,24,28,31   Further, no one affiliated with B&A called ARRT or the DOH  or visited their websites to verify that ARRT certification was sufficient. [ECF No. 122] at ¶¶48,57,58,59. Further, it was acknowledged by Alvarez and the Medical Directors that the X-rays performed by Alvarez during the Relevant Timeframe were performed in violation of Florida Law. [ECF No. 122] at ¶¶30,60, 65.

Accordingly, no genuine issue of fact exists that the X-rays conducted by Alvarez and identified on Exhibits D and E to the Complaint were performed in direct violation of Florida law. As such, State Farm is entitled to restitution of all monies it paid B&A for the illegal and unlawful services identified on Exhibit D of the Complaint and is entitled to an order declaring that the bills identified on Exhibit E that remain unpaid are unlawful and noncompensable.

---

[9] Florida Statutes sections 468.304(3) and 468.3065 provides that an applicant possessing certification from the ARRT may be exempted from repeating the knowledge based exam, but still must complete the application process and obtain certification from the Florida Department of Health, which is made clear on websites for both.  [ECF No. 122] at ¶31

## VII. THE X-RAY SERVICES RENDERED BY ORTIZ DURING THE RELEVANT TIMEFRAME WERE UNLAWFUL

### A. OVERVIEW OF APPLICABLE LAW

A Basic Machine Operator ("BMO") is the lowest level of technician who may perform X-ray services in Florida, and requires the least amount of education and testing in order to obtain certification. *See generally* 64E-3.0031(1), F.A.C; Fla. Stat. §§468.301(1) and (9); Fla. Stat. §468.304(3)(e). A BMO, unlike the other levels of technicians described in the RPCA, is defined as a person "*who is employed by a licensed practitioner* to perform certain radiographic functions…*under the direct supervision of that practitioner*." Fla. Stat. §468.301(1) (emphasis added). The RCPA further describes BMO's as being permitted to "perform general diagnostic radiographic and general fluoroscopic procedures…*under the direct supervision and control of a licensed practitioner in that practitioner's office*." Fla. Stat. §468.302(3)(a) (emphasis added).

The RCPA specifically defines a "licensed practitioner" as "a person who is licensed or otherwise authorized by law to practice medicine, podiatric medicine, chiropody, osteopathic medicine, naturopathy, or chiropractic medicine in this state." Fla. Stat. §468.301(11). "Direct supervision" is defined as "supervision and control by a licensed practitioner who assumes legal liability for the services rendered by the basic X-ray machine operator…*which supervision requires the physical presence* of the licensed practitioner for consultation and direction of the actions of the basic X-ray machine operator…." Fla. Stat. §468.301(7). "Physical presence" means "within the facility housing the equipment used by a basic X-ray machine operator." 64E-3.002(4), F.A.C. Thus, in order to lawfully employ a BMO, the technician must be employed by a licensed practitioner and work in that licensed practitioner's office. In addition to these requirements, lawful use of a BMO requires the technician to be "directly supervised," meaning that the licensed practitioner is present in the facility when the BMO is performing X-ray scans.

### B. ORTIZ WAS NOT LAWFULLY EMPLOYED OR SUPERVISED.

The X-rays performed by Ortiz during the Relevant Time Period were in violation of the RCPA and unlawful for three independent reasons: 1) Ortiz was admittedly not employed by a licensed practitioner 2) Ortiz was not employed in that practitioner's office; and 3) Ortiz was not under the "direct supervision" of a licensed practitioner when performing the X-ray scans at issue. For the Relevant Time Period that Ortiz was conducting the X-rays at B&A identified in the Complaint, Exhibits I and J, it is undisputed:

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

- Ortiz held a certificate from the Department of Health as a Basic Machine Operator [ECF No. 122] at ¶32;
- Ortiz was hired by Aguilar to conduct X-rays full time [ECF No. 122] at ¶33;
- Ortiz was an employee of B&A, a layperson owned clinic and was not employed by a licensed practitioner, nor was it the "office of" any licensed practitioner [ECF No. 122] at ¶¶34;36;
- Ortiz, performed the X-rays identified on Exhibits I and J of the Complaint on State Farm Fire insureds [ECF No. 122] at ¶43;
- B&A did not employ any licensed practitioners [ECF No. 122] at ¶37.

Accordingly, the X-ray scans performed by Ortiz and billed to State Farm by B&A identified on Exhibits I and J to the Complaint were performed unlawfully and in violation of Florida law.  Fla. Stat. §468.301.  Additionally, the X-rays identified on Exhibits I and J were also unlawful because Ortiz was not "directly supervised" by a licensed practitioner when the X-rays were performed.  For the relevant time period, the following additional facts are undisputed:

- Dr. Genao never supervised Ortiz conducting the X-rays [ECF No. 122] at ¶¶41, 42, 50;
- Dr. Genao was only physically present at B&A every other week [ECF No. 122] at ¶38;
- Ortiz performed two to six X-rays at B&A on a daily basis during the Relevant Time Period [ECF No. 122] at ¶40;
- B&A had no policy requiring a Medical Director be present when Ortiz performed X-rays, and Ortiz routinely conducted X-rays with no licensed practitioner present [ECF NO. 122] at ¶41;
- Dr. Genao did not supervise Ortiz taking X-rays, and had no knowledge of what a "BMO" was  [ECF No. 122] at ¶51;
- Dr. Genao would be present at B&A approximately once every one or two weeks during his tenure as Medical Director [ECF No. 122] at ¶38;
- Dr. Alonso was only physically present at B&A approximately once per *month* and no one knew when he would come to B&A.  [ECF No. 122] at ¶39;
- Dr. Alonso had no awareness that a BMO had to be directly supervised, and made no attempt to directly supervise him [ECF No. 122] at ¶ 61, 62;
- Dr. Alonso acknowledged that the X-rays performed by Ortiz were performed in violation of Florida law [ECF No. 122] at ¶44.

In *State Farm Mut. Auto. Ins. Co. v. CR Diag. Center, Inc.*, Case No. 1:08-cv-20802-BLG, Southern District of Florida, the Court granted summary judgment in favor of State Farm based on a similar set of facts. *See CR Diag.*, 08-cv-20802 at DE-53. [ECF No. 118-23] In *CR Diag.*, as here, CR Diagnostic was a health care clinic owned by a layperson that employed a BMO. *See CR Diag*., Motion for Summary Judgment, 2008 WL 5734166. [ECF No. 118-24] The Medical Director was physically present at the clinic once per week, and did not physically supervise the BMO in the actual performance of taking the X-ray. *Id.* Accordingly, the District

Court granted summary judgment in favor of State Farm holding that "the defendant …conducted illegal practices contrary to the laws of the State of Florida, and has violated such laws by failing to supervise its radiology personnel, thus entitling [State Farm] to a summary judgment." [ECF No. 118-23] The Court held that no genuine issues as to any material fact existed and awarded State Farm restitution in excess of $1.1 million already paid for services rendered by the BMO, and also entered summary judgment declaring that any outstanding bills that remained unpaid were unlawful and illegal and therefore noncompensable. *Id.*

Accordingly, no genuine issue of fact exists that the X-rays conducted by Ortiz identified on Exhibits I and J of the Complaint were performed in direct violation of Florida law. As such, State Farm is entitled to restitution of all monies it paid B&A for the illegal and unlawful services identified on Exhibit I of the Complaint and is entitled to an order declaring that the bills identified on Exhibit J that remain unpaid are unlawful and noncompensable.

## VIII. THE MEDICAL DIRECTORS AT B&A DURING THE RELEVANT TIME PERIOD FAILED TO PERFORM THEIR LEGAL OBLIGATIONS.

### A. CLINIC LICENSURE AND THE REQUIRED DUTIES OF MEDICAL DIRECTORS UNDER FLORIDA LAW.

Florida's Health Care Clinic Act ("HCCA"), section 400.990 *et seq.*, Florida Statutes, requires that all health care clinics be licensed by the Agency for Health Care Administration ("AHCA") unless they qualify for an exemption. Fla. Stat. §400.991. The Florida Legislature declares that "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers." Fla. Stat. §400.990(2). Accordingly, the express purpose of the HCCA "is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by [AHCA]." *Id.* In furtherance of the goal of clinic oversight, the HCCA requires that licensed clinics which are owned by non-licensed (non-medical) individuals designate a "Medical Director" to provide oversight and undertake legal responsibility to comply with all applicable laws, including the express obligations of Florida Statute and the Florida Administrative Code. *See* Fla. Stat. §400.9935(1); §59A-33.008(1), F.A.C. The Medical Director "shall agree in writing to accept legal responsibility" for the activities expressly identified in the HCCA. *Id.*; Fla. Stat. §400.9905(5) (" 'Medical Director' means a physician who is employed or under contract with a clinic and who maintains a full and unencumbered physician license….") Any agreement to serve as a Medical

Director that does not comply with the statutory requirements of the HCCA is deemed void as contrary to public policy. *See* Fla. Stat. §400.9935(2).

In order to operate lawfully and maintain clinic licensure the HCCA requires the Medical Director of the clinic to, among other things, assume responsibility for a myriad of responsibilities as outlined in §400.9935 (a)-(g), Florida Statute. Amongst these statutory obligations, the Medical Director must ensure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided. Fla. Stat. §400.9935(1)(d). The Medical Director must also ensure that any billing for services rendered by the clinic do not contain charges that are ***fraudulent*** or ***unlawful***, and must conduct "systematic reviews" of the clinic's billing to ensure the clinic is billing lawfully. Fla. Stat. § 400.9935(1)(g).

In addition to the requirements of a Medical Director outlined in §400.9935, AHCA has adopted rules set forth in the Florida Administrative Code requiring day-to-day supervision by a Medical Director[10]. Section 59A-33.008(1), F.A.C. states:

> A licensed health care clinic **may not operate or be maintained without the day-to-day supervision** of a single medical or clinic director as defined in Section 400.9905(5), F.S. The health care clinic responsibilities under Sections 400.9935(1)(a)-(g), F.S., **cannot be met without an active, appointed medical or clinic director**. Failure of an appointed medical or clinic director **to substantially comply** with health care clinic responsibilities under Rule 59A-33.012, F.A.C., and Sections 400.9935(1)(a)-(g), F.S., shall be grounds for the revocation or suspension of the license and assessment of a fine pursuant to Section 400.995(1).

Any clinic billings whose Medical Director operates in violation of the Medical Director compliance statute results in unlawful charges which are noncompensable and unenforceable. Fla. Stat. §400.9935(3) ("All charges...on behalf of a clinic…that is otherwise operating in violation of the part, are unlawful charges, and therefore are noncompensable and unenforceable."); *see also* Fla. Stat. §627.736(1)(a).

Another District Court in Florida recently held that the failure of a Medical Director to perform "all required duties and responsibilities mandated by Florida law" rendered the services provided by the clinic unlawful and unenforceable. S*tate Farm Mut. Auto. Ins. Co. v. A&J Medical Center, Inc.*, Case No. 14-20066-CIV, 2015 WL 4387946, *2 (S.D. Fla. June 24, 2015). In *A&J*, like the instant matter, State Farm sued a healthcare clinic based on an unlawful auto insurance billing scheme resulting from A&J and its Medical Director's failure to comply with

---

[10] The HCCA gives rulemaking authority to AHCA and states AHCA "shall" adopt rules necessary to administer the HCCA.  Fla. Stat. §400.9925(1), (2).

the requirements for health care clinic licensure by not having a medical director who exercised all the required duties and responsibilities mandated by Florida law. *Id*. at *1-2.  As here, State Farm sued for unjust enrichment and declaratory relief. *Id*. at *4. The *A&J* Court granted Final Default Judgment against Defendants, and analyzed whether there was a sufficient basis in the pleadings for judgment to be entered. *Id*. at *2-5.

The Court held that, as a result of A&J and its Medical Director's failure to provide day-to-day supervision and failure to fulfill their statutory and administrative duties, A&J "did not qualify for a license." *Id*. at *3. Accordingly, the Court held that:

> by not having a medical director who exercised all required duties and responsibilities mandated by Florida law, A & J failed to comply with the requirements for health care clinic licensure. As a result, the services purportedly provided by A & J were unlawful and, therefore, all charges or reimbursement claims billed to State Farm by or on behalf of A & J are noncompensable and unenforceable.

*Id*. at. *4.

### B.  DRS. GENAO AND ALONSO DID NOT SUBSTANTIALLY COMPLY WITH FLORIDA LAW AS THE ACTING MEDICAL DIRECTOR OF B&A.

As has been detailed extensively herein (and in State Farm's Statement of Undisputed Facts in Support), Drs. Genao and Alonso engaged in a systematic and continuous failure to ensure B&A was operating under the most basic standards required by Florida law. *See* Fla. Stat. §400.990 ("the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers. The purpose of this part is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics…") The record presents no genuine issue of fact that Drs. Genao and Alonso fell woefully short of lawfully performing their obligations as Medical Directors on a host of levels. In summary, they plainly failed to:

- ensure that all health care practitioners providing health care services…to patients maintained had ***active appropriate certification or licensure for the level of care being provided*** [§400.9935(1)(d) Fla. Stat.] [ECF No. 122] ¶¶44,48,60,63;
- ***agree in writing*** to accept legal responsibility for the clinic as the Medical Director [§400.9935(1)(a) Fla. Stat.[11]] [ECF No. 122] at ¶¶46,56;
- conduct systematic reviews to ensure that billings are not ***fraudulent*** [§400.9935 (1)(g) Fla. Stat.] [ECF No. 122] at ¶¶10,11,49,64,65;
- conduct systematic review to ensure that billings are not ***unlawful*** [§400.9935 (1)(g) Fla. Stat.] [ECF No. 122] at ¶¶30,44,49,60,64,65;

---

[11] As previously indicated, Dr. Genao at no point had a written agreement with B&A, while Dr. Alonso failed to for the first year of his tenure as Medical Director to have a written agreement.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

- provide the "day-to-day" supervision of B&A §59A-33.008, F.A.C. [ECF No. 122] at ¶¶23,47,50,52,66.

These doctors admit to complete ignorance of those statutes that pertained to the lawful operation of a healthcare clinic, conducting of X-rays, the requirements placed upon Medical Directors, and what constitutes insurance fraud in billing for PIP benefits.  [ECF No. 122] at ¶¶12,47,48,51,62. The Medical Directors presence at the clinic once (Alonso) or twice (Genao) a month, for a few hours (at unpredicted times), and complete obliviousness to the laws regulating Florida health care clinics demonstrates that they failed in their most basic duty to provide day-to-day oversight and supervision of B&A. [ECF No. 122] at ¶¶38,39  In addition to the numerous statutory violations identified above, the doctors had no role in the required day-to-day supervision including interviewing, hiring, verifying certifications, choosing vendors to interpret the diagnostic studies, monitoring the equipment, overseeing violations found by the Florida Department of Health, training of staff, as well as ensuring following of safety guidelines for diagnostic facilities. [ECF No. 122] at ¶¶9,23,47,50,52,66.

These deficiencies at B&A went undetected, as the Medical Directors did not conduct systematic reviews of clinic billings to ensure they were not underlined unlawful or underlined fraudulent. Fla. Stat. § 400.9935(g). The Medical Directors failed to identify, correct, or even inquire as to B&A's intentional or indifferent practice of failing to comply with Florida law.  State Farm did not learn of the wholesale noncompliance of the Medical Directors until June and July of 2014. [ECF No. 93] at numbers 5(p.6) and 6(p.7).

Accordingly, the Medical Directors' failure to comply with their statutory and administrative code duties rendered the charges at issue during the Relevant Time Period unlawful, noncompensable and unenforceable.  Fla. Stat. §400.9935(3).

## IX. BECAUSE ALL CHARGES WERE UNLAWFUL AND NON-COMPENSABLE, SUMMARY JUDGMENT IS APPROPRIATE ON STATE FARM'S CLAIMS.

As established in the foregoing sections, no genuine issue of fact remains that B&A did not operate lawfully during the Relevant time period because its Medical Directors failed to comply with most, if not all, of their obligations under Florida law. Additionally, B&A did not operate lawfully during the relevant time period because it was engaged in the general business practice of waiving, or failing to make any effort to collect, copayments or deductibles from its insureds. Finally (as to Fire), the services rendered by Alvarez and Ortiz were unlawful because they were not properly certified, employed and/or supervised as required by Florida law. As a

result, summary judgment is thus appropriate on State Farm's claims for unjust enrichment and declaratory relief.

A. UNJUST ENRICHMENT (COUNT I).

The elements for a claim of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. *Med. Serv. Center*, 2015 WL 2170396, at *9 (citations omitted). It is well settled that Florida law supports a cause of action for unjust enrichment upon a defendant's acceptance and retention of a benefit "that it is not legally entitled to receive in the first place." *Silver Star*, 739 F.3d at 584.  The Eleventh Circuit in *Silver Star* reasoned:

> As for the unjust enrichment claim, Florida courts have long recognized a cause of action for unjust enrichment "to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Butler v. Trizec Props., Inc.*, 524 So.2d 710, 711 (Fla. 2d DCA 1988). State Farm claimed in this case that Silver Star was unjustly enriched because it accepted payments from State Farm that it was not entitled to under Florida law. **If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment.**

*Id.*[12] at 584; *Med. Serv. Center*, 2015 WL 2170396, *9 (granting summary judgment in favor of insurer and holding that an insurer can refuse payment for services unlawfully rendered as "it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary"); *see also State Farm Mutual Auto. Ins. Co. vs. Physicians Group of Sarasota, LLC*, 9 F.Supp.3d 1303, 1312 (M.D. Fla. 2014) (finding that if services were unlawful, then insurer was under no obligation to pay for the services and payment thereof substantiates a claim for unjust enrichment); *State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc.*, 2011 WL 6450769, *_ (M.D. Fla. 2011) (holding that insurer did not bargain for unlawfully rendered medical services, and provider's retention of payments for these services was sufficient to support cause of action for unjust enrichment).

It is undisputed that State Farm conferred a benefit on B&A in the amount of $1,478,848.40 for the services identified in the Complaint, and that B&A voluntarily accepted

---

[12] The *Silver Star* Court found that Florida law was clear on this issue and denied Silver Start's motion to certify questions to the Florida Supreme Court. *Id.* at fn. 4.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

and retained this benefit. [ECF No. 66] It is also undisputed that Defendants, Drs. Alonso, Genao and Alvarez, received the benefit of the illegal and improper payments to B&A in the form of salaries and additional payments. [ECF No. 122] at ¶¶45, 54. As this Court has already held, "there is significant case law holding that a defendant is not required to individually receive payments in order for a cause of action for unjust enrichment to exist." *State Farm Mut. Auto. Ins. Co. v. B&A Diag., Inc.*, --- F.Supp.3d ---, 2015 WL 2217312, *7 (S.D. Fla. Apr. 6, 2015) [ECF No. 32]; *see also State Farm Fire & Cas. Co., et al. v. A&J Med. Ctr., Inc., et al.*, Case No. 14-cv-20066-CMA (S.D. Fla. May 15, 2014) (ECF No. 51) (the fact that a defendant may have received PIP benefits indirectly and may not have had actual "knowledge of the benefits" is insufficient to compel dismissal of the claim). It was the failure of B&A and its Medical Directors to comply with Florida law that resulted in the improper benefits bestowed upon them by State Farm. Likewise, Alvarez was also personally responsible to ensure he was properly certified in order to radiate patients at B&A, and was paid by B&A directly for the illegal services he provided. "[I]t would be most inequitable for [Defendants]" to accept and retain the benefits they received as a direct result of their participation and responsibility in the scheme. *See Malamud v. Syprett*, 117 So. 3d 434, 438-39 (Fla. 2d DCA 2013) (*citing Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F.Supp. 1439, 1446 (M.D. Fla. 1998) (concluding that a claim for unjust enrichment is actionable against the principal of a corporation which received value from the plaintiff where the principal was directing corporate operations and noting that "it would be most inequitable for [the principal] to accept the benefit conferred by plaintiffs without compensating them"); *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F.Supp. 2d 1269, 1288 (S.D. Fla. 2013) ("There are several recent cases in this district that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary, pointing out that direct contact, or privity, is not the equivalent of conferring a direct benefit.")

As set forth above, no genuine issue of material fact remains that the services performed at B&A, under the supervision of Dr. Genao and Dr. Alonso, and identified on Exhibits D, E, I, J, M, N, O and P to the Complaint, were not "lawfully provided" and are therefore non-compensable. Because Defendants were not legally entitled to receive the payments identified on Exhibits D, I, M, and O to the Complaint in the first place, Florida law provides a cause of action for unjust enrichment for restitution of the payments made by State Farm for those services. Accordingly, State Farm is entitled to summary judgment against Defendants as follows:

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

- Judgment in favor of State Farm Mutual and against B&A and Dr. Genao, jointly and severally, in the amount of $316,315.63. [ECF No. 66] at ¶3; [ECF No. 1-19];
- Judgment in favor of State Farm Fire and against B&A and Dr. Genao, jointly and severally, in the amount of $178,866.72 [ECF No. 66] at ¶4; [ECF No. 1-19];
- Judgment in favor of State Farm Mutual and against B&A and Dr. Alonso, jointly and severally, in the amount of $811,254.59 [ECF No. 66] at ¶5; [ECF No. 1-21];
- Judgment in favor of State Farm Fire and against B&A and Dr. Alonso, jointly and severally, in the amount of $172,411.46 [ECF No. 66] at ¶6; [ECF No. 1-21];
- Judgment in favor of State Farm Fire and against B&A and Alvarez in the amount of $43,290.73[13] [ECF No. 66] at ¶1; [ECF No. 1-10]; and
- Judgment in favor of State Farm Fire and against B&A in the amount of $28,210.58 [ECF No. 66] at ¶2; [ECF No. 1-15].

## B. DECLARATORY RELIEF (COUNT III)

As in *Silver Star*, State Farm is also entitled to a declaration that it is not required to pay Defendants the amount of Defendants' outstanding invoices. *See Silver Star*, 739 F.3d at 584; *Med. Serv. Center*, 2015 WL 2170396, at *9 (finding it appropriate to enter declaratory judgment confirming State Farm is not obligated to pay any bills during the relevant timeframe clinic was operating unlawfully), *Vizcay*, 2011 WL 5870016, at *3-4; *Active Spine Ctrs., LLC v. State Farm Fire and Cas. Co.*, 911 So. 2d 241, 242 (Fla. 3d DCA 2005) (affirming summary judgment for State Farm entering declaration that State Farm did not owe payment for claims of clinic which failed to comply with Florida licensing statute). Once Defendants submitted the fraudulent claims to State Farm, those claims became invalid and unpayable. *See Williams*, 563 Fed. Appx. at 671.

## X. CONCLUSION

For the foregoing reasons, summary judgment in favor of Plaintiffs on all claims is warranted and appropriate.

---

[13] If State Farm prevails on the issue of Medical Director duty noncompliance, with impacted claims identified on  [ECF No. 1-19] [ECF No. 1-21], please note the claims on exhibits [ECF No. 1-10] (Alvarez) and [ECF No. 1-15] (Ortiz) are already included in those damages. Accordingly, only a final judgment against Alvarez would be required for this amount.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Dated:  <u>August 28, 2015</u>
       Fort Lauderdale, Florida

Respectfully submitted,

By:  <u>/s/ Sandra L. Heller</u>
David I. Spector (Fla. Bar No. 086540)
david.spector@akerman.com
Sandra L. Heller (Fla. Bar No. 037055)
sandra.heller@akerman.com
Nicholas J. Purvis (Fla. Bar No. 054268)
nicholas.purvis@akerman.com
**AKERMAN LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, Florida 33301-2999
Telephone: (954) 463-2700
Facsimile: (954 463-2224
*Counsel for State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified in the list below via transmission of Notices of Electronic Filing generated by CM/ECF.


By:   /s/ Sandra L. Heller
Sandra L. Heller
Fla. Bar No. 037055


## SERVICE LIST

Munir D. Barakat, Esq.
mdb@barakatlegal.com
BARAKAT LEGAL, P.A.
255 Alhambra Circle
Suite 900
Coral Gables, Florida 33134
786-472-1812 (phone)
786-545-7195 (fax)

*Attorneys for Defendants: B&A Diagnostics, Inc. n/k/a Oasis Medical Center Corp., C. Esteban Genao, M.D., Ernesto Alvarez Velasco*

Michael Cosculluela, Esq.
Cosculluela & Marzano
14211 Commerce Way
Suite 300
Miami Lakes, FL 33016-1555
305-828-1909 (phone)
305-503-6795 (fax)
mcosculluela@cmpalaw.com

*Attorneys for Defendant Alex Alonso, M.D.*